2000 SD 63

**SIOUX FALLS ARGUS LEADER, Associated Press, Mitchell Daily Republic, KDLT, KELO, KEVN, KMIT, KSFY, Sorenson Broadcasting, South Dakota Newspaper Association and KOTA, Media, applicants,**

v.

**The Honorable Ronald K. MILLER, Fourth Circuit Judge, Respondent.**

**No. 21334.**

Supreme Court of South Dakota.

Origional Proceeding

Argued March 20, 2000.

Decided May 10, 2000.

---

78

Jon E. Arneson, Sioux Falls, for applicants.

Mark Barnett, Attorney General, Lawrence E. Long, Chief Deputy Attorney General, Jeffrey P. Hallem, Asst. Attorney General, Pierre, for respondent.

PER CURIAM.

[¶ 1.] The Sioux Falls Argus Leader and other members of the media (Media)[1] seek a writ of prohibition alleging that Circuit Court Judge Ronald K. Miller exceeded his authority in entering a pretrial participant gag order in the matter of State v. Layne and Wagaman, CR 99–144. The order, *inter alia*, prohibits trial participants from publicly discussing the case. Media claims this order violates its First Amendment right of freedom of the press. We granted an alternative writ, ordering the State and Judge Miller to show cause why the writ should not be made permanent. We now hold the participant gag order is neither unconstitutional nor excessive of the trial court's authority. We deny Media's application.

### FACTS AND PROCEDURE

[¶ 2.] Following the death on July 21, 1999 of 14–year–old Gina Score at a state training school in Plankinton, the State filed criminal charges against Raelene Layne and Tamara Wagaman, former employees of the school, alleging manslaughter and felony child abuse.[2] Governor William J. Janklow, who had earlier publicly claimed that the State of South Dakota was liable regarding the events surrounding Score's death, later inferred the former employees were at fault and that they had acted outside the school's prescribed policies. Former United States Representative and Senator and one of Wagaman's attorneys, James Abourezk, held a press conference at his Sioux Falls office seeking to place his client in a more favorable public light. He explained to reporters that Governor Janklow and the attorney general's office "have had four months to 'demonize'" his client. Attorney Timothy Whalen held a similar press conference November 29 in his Lake Andes office regarding the charges against Layne, his client. Immediately after these press conferences, it was reported by the media that Governor Janklow had remarked that unless Abourezk stopped talking to the press, he (the governor) would "start telling all the potential jurors in South Dakota exactly what the facts are." The governor was quoted in this same article as stating, "I got mad when I found out that Gina Score died by the actions of some people." (Associated Press, December 1, 1999).

[¶ 3.] On November 29, 1999, State filed a pretrial motion seeking an order prohibiting the attorneys, parties and witnesses involved from discussing the case with members of the press. A hearing on this motion was scheduled for December 10. Media's request to appear and to challenge the motion was granted. At the hearing,

1. Applicants are the Sioux Falls Argus Leader, Associated Press, Mitchell Daily Republic, KDLT, KELO, KEVN, KMIT, KSFY, Sorenson Broadcasting, South Dakota Newspaper Association, and KOTA.

2. The manslaughter charges were dismissed by the court following a preliminary hearing held January 11–13, 2000.

both the prosecution and defendant agreed that the court should issue the gag order to protect Layne's and Wagaman's constitutional right to a fair trial. On December 17, 1999, the trial court entered an order prohibiting certain conduct it believed would inhibit both the State's and the defendants' rights to fair and impartial proceedings that may eventuate in a trial.[3]

## ANALYSIS AND DECISION

### Availability of Writ

■■■ [¶ 4.] This Court has both constitutional and statutory authority to issue writs of prohibition to arrest the proceedings of any tribunal when such proceedings are without jurisdiction or in excess of the power of authority conferred by law upon the tribunal. S.D. Const. art. V, § 5, SDCL 21–30–1, 21–30–2; *Cummings v. Mickelson*, 495 N.W.2d 493, 495 (S.D. 1993). Writ of prohibition is an extraordinary remedy and is available only when there is no "plain, speedy and adequate remedy in the ordinary course of law." SDCL 21–30–2. The applicant must be one who is "beneficially interested." SDCL 21–30–3.

■■ [¶ 5.] In applying for a peremptory writ of prohibition, Media claimed Judge Miller's participant gag order violated its First Amendment rights and that the court acted in excess of its authority. Media was not in a position to seek a remedy by direct appeal because it is neither a party to the underlying action nor specifically enjoined by the order from discussing the case. However, Media's First Amendment rights are affected by the gag order, as is noted below, and it would be without a remedy should we find prohibition could not be invoked. There being no "plain, speedy and adequate remedy" available to

it in the ordinary course of law, and concluding Media has a beneficial interest in the outcome, we deem it appropriate to review the trial court's gag order in this prohibition action.

### Standing

■■ [¶ 6.] We must also initially determine whether Media, a nonparty to the underlying lawsuit, has standing to challenge the gag order. Standing requires that a party allege (1) a personal injury in fact, (2) a violation of his or her own, not a third-party's rights, (3) that the injury falls within the zone of interests protected by the constitutional guarantee involved, (4) that the injury is traceable to the challenged act, and (5) that the courts can grant redress for the injury. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472–74, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982).

■■ [¶ 7.] The United States Supreme Court has previously determined that the First Amendment protects the right to receive information and ideas. *See Application of Dow Jones & Co., Inc.* 842 F.2d 603, 606–08 (2nd Cir.1988) (discussing this right and citing Supreme Court cases). *See also Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972) ("without some protection for seeking out the news, freedom of the press could be eviscerated."). However, the Supreme Court has also held that "[t]he right to speak and publish does not carry with it the *unrestrained right* to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965) (emphasis added); *Richmond Newspapers v. Virginia*, 448 U.S. 555, 576, 100 S.Ct. 2814, 2827, 65 L.Ed.2d 973 (1980).[4]

---

**3.** It should be noted that almost identical orders were entered in the capital murder cases of State v. Donald Moeller (in 1996 with Judge Arthur L. Rusch presiding) and State v. Robert Leroy Anderson (in 1998 with Judge Tim D. Tucker presiding). These orders were never challenged by the media.

**4.** *See Radio & Television News Ass'n v. United States Dist. Ct.*, 781 F.2d 1443, 1446 (9th Cir.1986) (citing *Richmond Newspapers, supra*, and noting the Supreme Court described the press' right to gather information as the right only to "sit, listen, watch, and report").

■ [¶ 8.] Other courts have held that news agencies have standing to challenge court orders in an effort to obtain information or access to judicial proceedings, though the agencies are neither parties to the litigation nor directly restrained by those orders. *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 777 (3rd.Cir.1994); *Davis v. East Baton Rouge Parish Sch. Bd.,* 78 F.3d 920, 926–27 (5th Cir.1996); *CBS, Inc. v. Young,* 522 F.2d 234, 238 (6th Cir.1975); *Radio & Television News Ass'n,* 781 F.2d at 1445; *Journal Publishing Co. v. Mechem,* 801 F.2d 1233, 1235 (10th Cir.1986). Applying the test for standing set forth in *Valley Forge Christian College, supra,* we note that here Media has been injured because the order, though not directed at Media, restricts some of the sources to which it may turn or has turned for information about the underlying criminal action. The violation, if one is found to exist, is to Media's own rights as potential recipients of speech rather than a third party's, and the injury falls within the zone of interests protected by the First Amendment. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976). We conclude that Media has standing to challenge the validity of the order.

## First Amendment Challenge

[¶ 9.] Media directs its First Amendment challenge specifically to paragraphs 3 and 9 of the trial court's gag order. These two paragraphs are as follows:

3. No interviews or broadcasts shall be conducted inside the courtroom at any time.

9. This Court takes judicial notice of the pre-trial publicity which has already occurred in this cause, which includes extensive newspaper coverage, radio news broadcast coverage, and television news coverage. This Court further finds that there is a reasonable likelihood of prejudicial pretrial publicity which would make it difficult to impanel an impartial jury which would tend to prevent a fair trial. Therefore, no party to this action nor any attorney connected with this case as defense counsel or prosecutor, nor their employees or agents, nor any judicial officer or employee, nor any public official including but not limited to any law enforcement officer or any agent, deputy or employee of such persons, nor any juror, nor any witness having testified in this trial or summoned by request or subpoena to testify in this trial, shall release or authorize the release for public dissemination of any matters relating to this case, without prior permission of the Court. This Court recognizes the separation of powers inherent in our system of government and as such, nothing in this order shall be interpreted to restrict either the legislative branch or the executive branch of the State of South Dakota from conducting any interviews or investigations relating to this matter in the normal course of their duties.

Said persons also shall not express, outside of the Court, an opinion or make any comment for public dissemination as to the weight, value, or effect of any evidence as tending to establish guilt or innocence. Said persons also shall not make any statements outside of Court as to the nature, substance or effect of any testimony that has been given. Said persons also shall not make any out-of-court statement as to nature, source, or effect of any purported evidence alleged to have been accumulated as a result of this matter.

These provisions of the order will be addressed individually. It is appropriate to note at the outset of this discussion that the Supreme Court has held that:

'Due process requires that the accused receive a trial by an impartial jury free from outside influences: Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors,

*the trial courts must take strong measures to ensure that the balance is never weighed against the accused.... Of course, there is nothing that proscribes* the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should *continue the case* until the threat abates, *or transfer it* to another county not so permeated with publicity. In addition, *sequestration of the jury* was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from outside interferences. *Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.* Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.'

*Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 553–554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976) (quoting *Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966)) (emphasis added by the Court in *Nebraska Press Ass'n* ). *See also Revised Free Press–Fair Trial Guidelines of the Judicial Conference of the United States,* 87 FRD 519, 523–30 (1980) (discussing Supreme Court cases and noting professional studies recommend that, in appropriate cases, trial courts limit what attorneys, parties, witnesses and court personnel may say to the public).

## Paragraph 3

■ [¶ 10.] Paragraph 3 of the gag order restrains Media by excluding one location from which it may interview and broadcast its reports.[5] This is a "time, place and manner" restriction that does not violate Media's First Amendment rights. "The 'time, place, or manner' test was developed for evaluating restrictions on expression taking place on public property which had been dedicated as a 'public forum.'" *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).[6] In *Richmond Newspapers,* the Supreme Court observed that:

> People assemble in public places not only to speak or to take action, but also to listen, observe, and learn; indeed, they may 'assembl[e] for any lawful purpose, ...' Subject to the traditional time, place, and manner restrictions, streets, sidewalks, and parks are places traditionally open, where First Amendment rights may be exercised; a trial courtroom also is a public place where the people generally—and representatives of the media—have a right to be present, and where their presence historically has been thought to enhance the integrity and quality of what takes place.

*United States,* 518 F.2d 781, 782–83 (10th Cir.1975); *United States v. Hastings,* 695 F.2d 1278, 1280 (11th Cir.1983), *cert. denied sub nom. Post–Newsweek Stations, Florida, Inc., v. United States,* 461 U.S. 931, 103 S.Ct. 2094, 77 L.Ed.2d 303.

**5.** It is well settled that there is no constitutional right to take photographs of courtroom proceedings; Media does not attempt to assert such a right here. *Estes v. Texas,* 381 U.S. 532, 539–44, 85 S.Ct. 1628, 1653–54, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring); *Tribune Review Publ. Co. v. Thomas,* 254 F.2d 883, 884 (3d Cir.1958); *Seymour v. United States,* 373 F.2d 629, 631–32 (5th Cir. 1967); *Combined Commt. Corp. v. Finesilver,* 672 F.2d 818, 821 (10th Cir.1982); *Mazzetti v.*

**6.** The Supreme Court has also applied it to conduct occurring on private property. *See Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

. . . .

Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial. '[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.' It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets.

448 U.S. at 578 & 581, 100 S.Ct. 2814 n. 18, 100 S.Ct. at 2828 & 2830; n. 18, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (internal citations omitted).

 [¶ 11.] The Supreme Court's "time, place, and manner" analysis requires asking whether the speech restrictions in the injunction (i) were content neutral, (ii) were narrowly tailored to serve a significant government interest, and (iii) left open ample alternative channels for communication of the information. *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753, 105 L.Ed.2d 661. Certainly, the restriction in paragraph 3, precluding interviewing and broadcasting from the courtroom but not restricting any other location or the subject matter that is broadcast, meets this standard. The restriction is content neutral, protects a significant government interest in providing both parties with their Sixth Amendment right to a fair trial, and leaves open all other alternative locations for communication.[7]

7. *See U.S. v. Yonkers Bd. of Educ.,* 747 F.2d 111 (2d Cir.1984). In *Yonkers,* a newspaper reporter brought a First Amendment challenge against a local rule that barred the use of cassette tape recorders in the courtroom. The court held that because the rule did not violate the reporter's right of access nor prohibit him from communicating any of what he

[¶ 12.] Paragraph 3 also comports with the trial court's duty to maintain order, dignity and decorum in the courtroom. Canon 3, Code of Judicial Conduct, SDCL ch. 16–2, Appx., Section B(12) instructs that "[a] judge should prohibit broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recess between sessions" with enumerated exceptions not relevant here. *See* 20 Am.Jur.2d Courts, *Inherent Powers* § 43 (1995); *State v. Means,* 268 N.W.2d 802, 808 (S.D.1978) ("a trial judge has an inherent power, as well as a duty, to conduct a fair and orderly trial [and] ... the court has the authority to issue such proper orders as may be necessary from time to time.") (citing *United States ex rel. Robson v. Malone,* 412 F.2d 848 (7th Cir.1969); *Comstock v. United States,* 419 F.2d 1128 (9th Cir.1969)); and *Sheppard,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. Judge Miller's restriction protects the dignity of the courtroom during these proceedings and, as noted above, is in place to preserve the participants' Sixth Amendment rights.

### Paragraph 9

 [¶ 13.] It is important to note that the gag order does not prohibit the press from broadcasting information or commentary gleaned from other sources, including its own attendance at the proceedings. It prohibits extrajudicial discussion of the case by specifically identified persons involved with the criminal lawsuit.

[13, 14] [¶ 14.] Media argues the order impinges its role in informing the public "about happenings in its government." However, the governmental events are the legal proceedings occurring in the courtroom, the subject of which the press is not prohibited from reporting under this order.[8] The Supreme Court has repeatedly

observed to his readers, the rule was merely a "time, place, and manner" restriction which was found to be reasonable and was upheld. *Id.* at 114.

8. On this note, the Ninth Circuit Court of Appeals has observed:

held that the First Amendment grants the press no right to information about a trial superior to that of the general public. *Houchins v. KQED, Inc.,* 438 U.S. 1, 10–12, 16, 98 S.Ct. 2588, 2594–95, 2597, 57 L.Ed.2d 553 (1978); *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609–10, 98 S.Ct. 1306, 1317–18, 55 L.Ed.2d 570 (1978); *Pell v. Procunier,* 417 U.S. 817, 833–35, 94 S.Ct. 2800, 2809–2810, 41 L.Ed.2d 495 (1974); *Branzburg,* 408 U.S. at 684–85, 92 S.Ct. at 2658, 33 L.Ed.2d 626. *See Davis,* 78 F.3d at 928 ("the news media have no right to discover information that is not available to the public generally"). "It is axiomatic that the First Amendment guarantee of freedom of the press is for the benefit of all the people and not a device to give the press a favored status in society." *CBS, Inc.,* 522 F.2d at 238. The cases upon which Media relies involving orders closing trials to the press and public are inapposite as such a situation does not exist here.[9]

[¶ 15.] Media also relies on those cases holding that a participant gag order is an unconstitutional prior restraint on the press.[10] In its responsive brief, however, Media concedes its First Amendment challenge does not involve a *classic* prior restraint case. Media's First Amendment right consists of the right to gather and report the news. However, it has no constitutional right to information about a trial beyond what is seen and heard in the courtroom. The restriction imposed upon the trial participants by Judge Miller's order does not gag Media or violate its First Amendment rights. As noted by the Ninth Circuit Court of Appeals addressing a media challenge to a participant gag order:

> [M]edia is free to attend all of the trial proceedings before the district court and to report anything that happens. In fact, the press remains free to direct questions at trial counsel. Trial counsel simply may not be free to answer. In sum, the media's right to gather news and disseminate it to the public has not been restrained.

*Radio & Television News Ass'n,* 781 F.2d at 1446.

[¶ 16.] We recognize that there is a split of authority as to whether participant gag orders constitute prior restraints on the

---

Undoubtedly, access to trial participants would assist the media in understanding the issues, litigation strategies, and evidence presented in the criminal proceeding. But the 'right to gather information' does not include a constitutional 'right' to understand what has been gathered. The press must rely upon its own resources to interpret and articulate the information it has obtained. We note in this respect that many news organizations have retained the services of attorneys and legal scholars to assist in reporting and editorial commentary on legal matters, such as newsworthy court proceedings.

*Radio & Television News Ass'n,* 781 F.2d at 1446, n 3.

9. In this respect, it must be noted that the so-called "Mansion" cases decided by this Court are also inapposite as they involved closed juvenile proceedings and the general protection of juveniles, factors not present here. *Sioux Falls Argus Leader v. Young,* 455 N.W.2d 864 (S.D.1990); *In re Hughes County,* 452 N.W.2d 128 (S.D.1990). *See also Assoc. Press v. Bradshaw,* 410 N.W.2d 577 (S.D.

1987), *superseded by statute as stated in In re M.C.,* 527 N.W.2d 290 (S.D.1995).

10. Media relies on *Montana ex rel Missoulian v. Montana Dist. Ct.,* 281 Mont. 285, 933 P.2d 829 (1997), and the Ohio case upon which the Montana court relied, *State ex rel. NBC, Inc. v. Court of Common Pleas,* 52 Ohio St.3d 104, 556 N.E.2d 1120 (1990). The *Montana ex rel. Missoulian* holding is also based, in large part, on its state constitution's "right to know" provision. 933 F.2d at 841. The Ohio court, in a participant gag order case, noted the media challengers argued that the trial court must apply the same level of scrutiny to the gag order as is applied in closed trial challenges (so-called right of access cases). Without further explanation, the Ohio court applied this higher standard. *NBC, Inc.,* 556 N.E.2d at 1124. *See Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc.,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973.

media. *See Montana ex rel. Missoulian,* 933 P.2d at 838–40 (discussing the disagreement on this issue following *Nebraska Press Ass'n,* 427 U.S. at 556, 96 S.Ct. at 2801, 49 L.Ed.2d 683). *See also* Note, *A Prior Restraint by Any Other Name: The Judicial Response to Media Challenges of Gag Orders Directed at Trial Participants,* 88 Michigan Law Review 1171 (1990). In *Nebraska Press Ass'n,* the Supreme Court indicated that, in lieu of prior restraints on the press, restraints on trial participants may be an appropriate means for minimizing prejudicial communications concerning trial proceedings. 427 U.S. at 564, 96 S.Ct. at 2805, 49 L.Ed.2d 683. *See News–Journal Corp. v. Foxman,* 939 F.2d 1499, 1512 (11th Cir.1991) ("The Supreme Court has suggested a restrictive order limiting extrajudicial commentary of trial participants as an alternative to a prior restraint on the media." (citing *Sheppard,* 384 U.S. at 361, 86 S.Ct. at 1521, 16 L.Ed.2d 600)).

[¶ 17.] *Dow Jones,* 842 F.2d at 609, *cert denied,* 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365, represents the majority rule among the federal circuit courts having addressed the question. There, the Second Circuit Court of Appeals held that whether a gag order constitutes a prior restraint depends upon the status of the challenging party; it constitutes a prior restraint when challenged by the "individual gagged," but not when challenged by a "third party." The court distinguished prior restraints from participant gag orders by noting that they lack the "most offensive aspect of a prior restraint [which] is the censorship involved by forbidding the dissemination of information already known to the press and therefore the public." *Id.* at 608. Since the gag order does not directly restrain the press, it is not held to the same level of scrutiny as prior restraints and will be upheld if "reasonable." *Id.* at 609–10.

[¶ 18.] In so holding, the Second Circuit joined the Ninth Circuit in refusing to treat as a prior restraint, a gag order directed against the participants and challenged only by the media. *Radio & Television News Ass'n,* 781 F.2d at 1446. *Compare Levine v. United States District Court,* 764 F.2d 590, 595 (9th Cir.1985) (holding that the order at issue is properly characterized as a prior restraint on *counsel's* First Amendment right to free speech). The Fourth, Tenth and Eleventh Circuits are in accord with this position as well, with some circuits finding the orders constitutional even where challenged by the parties restrained. *See In re Russell,* 726 F.2d 1007 (4th Cir.1984), *cert. denied sub nom. Russell v. Flannery,* 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (participant gag order held constitutionally permissible against challenge brought by potential witnesses restrained by the order); *News–Journal Corp.,* 939 F.2d 1499 (noting the press was accorded its constitutional attendance and reporting rights and has not been limited directly in any manner by the participant gag order designed to preserve defendants' Sixth Amendment rights); *United States v. Tijerina,* 412 F.2d 661 (10th Cir.1969), *cert. denied,* 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (applying First Amendment and "reasonable likelihood" test to participant gag order and upholding criminal contempt order for violation by the defendants restrained). *See also* Charles H. Whitebread and Darrell W. Contreras, *Free Press v. Fair Trial: Protecting the Criminal Defendant's Rights in a Highly Publicized Trial by Applying the Sheppard–Mu'Min Remedy,* 69 S.Cal.L.Rev. 1587 (1996) (analyzing cases and concluding a participant gag order as recommended in *Sheppard* combined with voir dire to determine impartiality strikes the necessary balance between defendants' and the media's constitutional rights and interests).

[¶ 19.] In the leading case of those courts holding the opposite viewpoint, the Sixth Circuit Court of Appeals ordered a district court to vacate a participant gag

order challenged by the press. *CBS, Inc.*, 522 F.2d 234.[11] The court held the order, which restrained participants, their relatives and close friends from discussion of the case with the media or the public, constituted an unconstitutional prior restraint on the press. In so holding, the court applied the "clear and present danger" standard. *Id.* at 240. *See also Journal Publ. Co.*, 801 F.2d at 1236 (holding order prohibiting jurors from *post-trial* interviews with press, where threat to administration of justice no longer existed, constituted a prior restraint on the media's First Amendment right to gather news); ·*Connecticut Magazine v. Moraghan*, 676 F.Supp. 38, 42–44 (D.Conn.1987) (extending *Journal Publ. Co.* and holding attorney gag order was an unconstitutional prior restraint on press' right to gather news); *Chase v. Robson*, 435 F.2d 1059 (7th Cir. 1970) (gag order restricting attorneys and defendants held unconstitutional where pretrial publicity was seven months old when order issued and was found to be overbroad; among other restrictions, the order prohibited public dissemination of court's rulings); *Rodgers v. United States Steel Corp.*, 536 F.2d 1001 (3rd Cir.1970).

[¶ 20.] Although the Supreme Court denied certiorari without comment in *Dow Jones*, Justices White, Brennan and Marshall filed a written dissent, expressly stating that the Second and the Sixth Circuits differed in both their constitutional analysis of this issue and the appropriate standard of review. *Dow Jones & Co., Inc. v. Simon*, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988). However, as noted, the Supreme Court elected not to address the matter and has yet to issue an opinion on this question. Moreover, the Supreme Court has never held that a clear and present danger to the right of a fair trial (the standard utilized by the Sixth Circuit in *CBS, Inc.*) must exist before a trial

court can forbid extrajudicial statements about the trial.

### Legal Standard

[¶ 21.] Although we hold that there is no violation of Media's restrained right to gather and report the news under the First Amendment by Judge Miller's participant gag order, we must still examine whether the order is beyond the trial court's authority and jurisdiction. To this end, we adopt the rule described in *Dow Jones*, which relies on the test announced by the Supreme Court in *Sheppard* and reaffirmed ten years later in *Nebraska Press Ass'n*, as the better reasoned and more appropriate rule to apply to participant gag orders in this state.

[¶ 22.] *Dow Jones* held the legal standard to determine whether a participant gag order can be justified is "whether there is a 'reasonable likelihood' that pretrial publicity will prejudice a fair trial." 842 F.2d at 610 (citing *Sheppard*, 384 U.S. at 363, 86 S.Ct. at 1522, 16 L.Ed.2d 600). Then, prior to entering an injunction against speech, the trial court must explore whether other available remedies would effectively mitigate the prejudicial publicity. *Id.* at 611 (citing *Nebraska Press Ass'n*, 427 U.S. at 562, 96 S.Ct. at 2804, 49 L.Ed.2d 683). Such alternative remedies may include change of venue,[12] trial postponement, a searching voir dire, emphatic jury instructions, and jury sequestration. *Id.* (citing *Nebraska Press Ass'n*, 427 U.S. at 563–64, 96 S.Ct. at 2804–05, 49 L.Ed.2d 683; *Sheppard*, 384 U.S. at 358–63, 86 S.Ct. at 1519–22, 16 L.Ed.2d 600). *See News–Journal*, 939 F.2d at 1515 (upholding participant gag order, with which all parties agreed, against media's First Amendment challenge, applying same *Dow Jones* standard). *See also Radio and Television News Ass'n*, 781 F.2d at 1447; *Russell*, 726 F.2d at 1010; *Tijerina*, 412 F.2d at 666

---

**11.** It should not escape notice that this case was decided in 1975, one year before the Supreme Court issued its opinion in *Nebraska Press Ass'n*.

**12.** Under SDCL 15–5–10, change of venue of actions filed in this state may only be upon motion by the defendant. *See Kolb v. Monroe*, 1998 SD 64, 581 N.W.2d 149.

(finding gag orders constitutionally permissible under reasonableness test); *cf. Hirschkop v. Snead,* 594 F.2d 356, 370 (4th Cir.1979) (rule prohibiting certain extrajudicial statements of lawyers did not violate their right to free speech where statements had a "reasonable likelihood of prejudice to fair administration of justice.").

### Standard Applied

[¶ 23.] Certainly this Court may take judicial notice, as did the trial court, of the significant pretrial publicity in the present case by both the broadcast and print media. SDCL 19–10–2. Attached to the State's answer to Media's application was a two-inch high stack of copies of printed pretrial publicity regarding the Gina Score case and related matters involving juvenile corrections in South Dakota. This stack comprises but a partial sampling of newsprint and internet coverage prior to the date Judge Miller entered the gag order. As noted above, the events surrounding this case have also received broad television coverage. It is not suggested that all of the pretrial publicity in the State's attachment is prejudicial.

[¶ 24.] Media claims this attachment is not properly before us as it was not produced for Judge Miller's benefit before he issued the gag order.[13] However, Judge Miller noted in his order that he was taking judicial notice of the pretrial publicity that had already occurred, including "extensive newspaper coverage, radio news broadcast coverage, and television news coverage." Facts that are not subject to reasonable dispute and are generally known within the court's territorial jurisdiction can be judicially noticed. SDCL 19–10–2(1). *See Poppen v. Walker,* 520

N.W.2d 238, 246 (S.D.1994). By definition, as a matter of general knowledge, Judge Miller was aware of the pretrial publicity affecting this case when he issued the order and so states in the order.

[¶ 25.] Moreover, this Court has previously held that it may consider a broader range of evidence on application for a writ of prohibition.

> The distinction between the writ of certiorari and the writ of prohibition lies mainly in the different modes in which the question of lack of administrative authority, or excess of jurisdiction, may be presented for review. The writ of certiorari brings up for review only the record of the proceedings before the inferior court, officer, board, or tribunal, and the questions must be determined upon that record alone. *The writ of prohibition brings before the court the evidence of all the facts alleged in the petition for the writ,* the allegations of which may be denied or controverted by the answer and an issue of fact thus framed, as in mandamus.

*Austin v. Eddy,* 41 S.D. 640, 172 N.W. 517, 519 (1919) (emphasis added). A writ of prohibition proceeding is not specifically a review of the record below; it is a review of the trial court's jurisdiction and authority in respect to the challenged order, and "is preventive in nature rather than corrective." Black's Law Dictionary at 1212 (6th ed. 1990).

[¶ 26.] As previously noted, main creators of this publicity are both prominent figures, state- and nationwide. Governor Janklow, the constitutional chief executive officer of the State, which is prosecuting the action against the state training school employees, at one point publicly admitted the State was liable. He has also been continually reported as

---

13. Media makes no claim that it was not provided the opportunity to produce evidence for Judge Miller's consideration. The trial court granted Media's request to appear at the motion hearing and challenge the State's motion for the participant gag order. *See Russell,* 726 F.2d at 1010 (order is not rendered unconstitutional for lack of " 'evidentiary hearing' or of specific, articulated findings" where the evidence considered by the trial court supports the determination that a reasonable likelihood exists the defendants would be denied a fair trial without proscribing certain of petitioner-witnesses' extrajudicial statements).

having said that the school's policy is sound "but that some workers did not follow the rules." The governor then threatened to tell "all the potential jurors in South Dakota exactly what the facts are" if Abourezk did not stop speaking to the press. These are highly inflammatory and potentially prejudicial statements. The gag order applies to Governor Janklow as a "public official" except for discussion of those matters specifically excluded from the order as noted in ¶ 28, *infra*.

[¶ 27.] Wagaman and Layne received additional unfavorable publicity when it was reported that the State attempted to drop them from the state's Public Entity Pool for Liability (PEPL). In that newspaper article, an attorney for the State reportedly stated that the fund should not cover "two former Plankinton boot-camp staff members who recklessly disregarded the safety of the juvenile inmates in their care." (Argus Leader, November 24, 1999).[14]

[¶ 28.] In the months since Gina Score's death on July 21, 1999, the episode, and the broad ramifications that have resulted from it, has received almost daily press coverage and has sparked investigation by federal agencies and commentary by national juvenile corrections officials, as well as editorials in local newspapers and letters from the public. Other students at the school have come forward with eyewitness accounts of conditions at the facility. The school's director position has been

replaced twice since Score's death; this has been the subject of extensive media coverage. As Judge Miller correctly implies in his order, this episode is the subject of ongoing interviews, investigations, and debate by the executive and legislative branches of our state government and such deliberation "in the normal course of their duties" is not restrained by the court's order. However, much of the publicity has involved discussion of who must shoulder the blame for this tragedy. Layne and Wagaman, the only two persons thus far criminally charged, are the most vulnerable.[15]

[¶ 29.] The record demonstrates that based upon the ongoing and sensational public nature of this case, the almost daily reporting of news connected directly or indirectly with it, and the commencement of a volley of accusatory statements by two high-profile participants, the trial court was justified in concluding there was, and would likely continue to be, intense and pervasive pretrial publicity surrounding this case. Judge Miller was further justified in concluding a reasonable likelihood existed that such publicity might impair the defendants' right to a fair trial. He specifically noted he considered less restrictive measures to the participant gag order, but found those measures to be ineffective in affording fair and impartial proceedings.[16]

### Overbreadth

[¶ 30.] Finally, Media claims the gag order is overbroad. "[O]verbreadth is

---

14. Here it is appropriate to note that in *Nebraska Press Ass'n*, the Supreme Court observed that:

> pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial. The capacity of the jury eventually impaneled to decide the case fairly is influenced by the tone and extent of the publicity, which is in part, and often in large part, shaped by what attorneys, police, and other officials do to precipitate news coverage.

427 U.S. at 554–55, 96 S.Ct. at 2800–01, 49 L.Ed.2d 683. In the present case, it may be argued that some attorneys for the state and state high public officials have already de-

termined Wagaman's and Layne's criminal culpability.

15. Score's parents have filed a civil suit in federal court against the State, Corrections Secretary Jeff Bloomberg, nurse Merridy Fett, Layne and Wagaman, school employee Roxanne Frey, former school superintendent Clay Ramsey, state employees Evan Edinger and Donald Johnson, and Sioux Valley Hospital. Abourezk represents Wagaman in this civil suit.

16. Media strongly implies in its responsive brief that the trial court failed to make this finding because it did not fully explain its thought processes on the record. Such de-

concerned with the First Amendment guarantees of free speech." *State v. Hauge,* 1996 SD 48, ¶ 5, 547 N.W.2d 173, 175 (citing *State v. Morrison,* 341 N.W.2d 635, 637 (S.D.1983)). "The test is 'whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest.'" *Id.* at ¶ 7, 547 N.W.2d at 176 (quoting *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 765, 114 S.Ct. 2516, 2525, 129 L.Ed.2d 593, 608 (1994)).

▮ [¶ 31.] Examination of the order shows that Judge Miller acted well within the constitutional limits of specificity in its drafting to sufficiently protect the Sixth Amendment rights of the parties involved to a fair and impartial trial while preserving Media's First Amendment rights to gather and report the news of the proceedings in this high-profile case. The order specifies to whom it applies, for how long it is in effect, and what type of speech is prohibited. Further, it delineates what type of speech is excepted from the court's restrictive order. The order burdens no more speech than is necessary to protect the parties' Sixth Amendment right to a fair trial. In *Nebraska Press Ass'n,* the Court noted:

> The dilemma posed underscores how difficult it is for the trial judges to predict what information will in fact undermine the impartiality of jurors, and the difficulty of drafting an order that will effectively keep prejudicial information from prospective jurors. When a restrictive order is sought, a court can anticipate only part of what will develop that may injure the accused. But information not

so obviously prejudicial may emerge, and what may properly be published in these 'gray zone' circumstances may not violate the restrictive order and yet be prejudicial.

427 U.S. at 566–67, 96 S.Ct. at 2806–07, 49 L.Ed.2d 683.

### CONCLUSION

▮ [¶ 32.] "When the exercise of free press rights actually tramples upon Sixth Amendment rights, the former must nonetheless yield to the latter." *Dow Jones,* 842 F.2d at 609 (citing *Pennekamp v. Florida,* 328 U.S. 331, 347, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295 (1946)). *See Estes,* 381 U.S. at 540, 85 S.Ct. at 1632, 14 L.Ed.2d 543 (Sixth Amendment right to fair trial is the "most fundamental of all freedoms" and "must be maintained at all costs"). Courts are duty-bound to ensure that a defendant receives a fair trial by an impartial jury. *United States v. Noriega,* 917 F.2d 1543, 1549 (11th Cir.1990), *cert. denied sub nom. Cable News Network, Inc. v. Noriega,* 498 U.S. 976, 111 S.Ct. 451, 112 L.Ed.2d 432; *United States v. Columbia Broadcasting System, Inc.,* 497 F.2d 102, 104 (5th Cir.1974).

> If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to

---

tailed explanation by a court that has stated on the record that it has made this consideration of alternative protective measures is not required and Media cites no supporting authority for its claim. *See Morrison v. Kimmelman,* 650 F.Supp. 801, 807 (D.N.J.1986) ("If a judge seeks to give reasons for a decision, we are wiser for what is said on the record. However, once a judicial opinion is written and filed, we are all as expert in its interpre-

tation as the hand that wrote it."). *See also United States v. Simon,* 664 F.Supp. 780, 791–92 (S.D.N.Y.1987); *aff'd,* 842 F.2d 603 (2d Cir.1988); *Russell,* 726 F.2d at 1009 (rejecting need for specific factual findings to support "reasonable likelihood" standard in participant gag order case). The trial court in this case made a specific finding that is supported by the record. Further explanation is not required to uphold the order.

**90**

frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.

*Sheppard,* 384 U.S. at 363, 86 S.Ct. at 1522, 16 L.Ed.2d 600.

[¶ 33.] The trial court did not err in entering the order. It made all the findings required of it under the *Dow Jones* standard. The December 17, 1999 order does not violate Media's First Amendment rights nor does it exceed the trial court's authority. Given the circumstances surrounding this case and the constitutional rights at issue, the trial court may have been remiss had it not entered the order. To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary.

*Gannett Co. v. DePasquale,* 443 U.S. 368, 378, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979) (internal citation omitted). In *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907), Justice Oliver Wendell Holmes, delivering the opinion of the Court, stated "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court and not by any outside influence, whether of private talk or public print." That is all that is being done here.

[¶ 34.] The application for peremptory writ of prohibition is denied.

[¶ 35.] MILLER, Chief Justice, and SABERS, AMUNDSON, KONENKAMP and GILBERTSON, Justices, participating.