#25631-JKM

**2011 S.D. 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

RAPID CITY JOURNAL,
ASSOCIATED PRESS and
SOUTH DAKOTA NEWSPAPER
ASSOCIATION,                                                    Applicants,

     v.

THE HONORABLE JOHN J. DELANEY,
SOUTH DAKOTA SEVENTH CIRCUIT
COURT JUDGE,                                                   Respondent.

\* \* \* \*

ORIGINAL PROCEEDING

\* \* \* \*

| | |
|---|---|
| JON E. ARNESON<br>Sioux Falls, South Dakota | Attorney for applicants<br>Associated Press and<br>South Dakota Newspaper<br>Association. |
| RODNEY SCHLAUGER of<br>Bangs, McCullen, Butler,<br>  Foye and Simmons, LLP<br>Rapid City, South Dakota | Attorneys for applicant<br>Rapid City Journal. |
| MARTY J. JACKLEY<br>Attorney General | |
| JEFFREY P. HALLEM<br>HAROLD H. DEERING, JR.<br>Assistant Attorneys General<br>Pierre, South Dakota | Attorneys for respondent. |

\* \* \* \*

ARGUED ON MARCH 21, 2011

OPINION FILED **09/07/11**

#25631

MEIERHENRY, Retired Justice

[¶1.]        This is an original proceeding for an alternative writ of mandamus or prohibition brought by the Rapid City Journal, the Associated Press, and the South Dakota Newspaper Association (collectively referred to as the Media) against the Honorable John J. Delaney, circuit court judge. The Media brought this action because Judge Delaney (1) imposed a gag order on the parties and (2) closed the trial and court records in a civil action involving the shareholders of Bear Country USA, Inc. The Media now requests that we grant a permanent writ of mandamus or prohibition requiring Judge Delaney to rescind "both the participant gag order and closure order and prohibit[ ] him from enforcing either."[1]

---

1.    The Media asserts that either a writ of mandamus or prohibition is "logically appropriate" in this matter. In its petition to commence an original mandamus or prohibition proceeding, the Media stated that "from the affirmative – mandamus – perspective, [the] Media are asking the Supreme Court to 'compel the admission of a party to the use and enjoyment of a right . . . to which [they are] entitled, and from which [they are] unlawfully precluded by [Judge Delaney].'" *See* SDCL 21-29-1. "From the negative – prohibition – view, [the] Media are requesting the Court to issue a writ that 'arrests the [judicial] proceedings . . . in excess of [Judge Delaney's] jurisdiction . . . or . . . [legal] powers of authority.'" *See* SDCL 21-30-1. Although this distinction does not matter in this case as the relief sought is the same under either mandamus or prohibition, we analyze this application as a writ of prohibition by following *Jundt v. Fuller*, 2007 S.D. 62, ¶ 14, 736 N.W.2d 508, 514:

> It has been held that: "a court may issue a writ [of prohibition] to confine a lower court to its proper jurisdiction, to compel the court to exercise a jurisdiction properly before it, or to prevent a clear abuse of discretion by the lower court." *In re State of S.D.*, 692 F.2d 1158, 1160 n.3 (8th Cir. 1982). *See also In re State,* 180 S.W.3d 423, 425 (Tex. App. 2005) (writ of prohibition operates like injunction issued by superior court to control, limit, or prevent action in court of inferior jurisdiction). Thus, in *Swezy v. Bart-Swezy,* 866 So. 2d 1248 (Fla. Dist. Ct. App. 2004), the
>
> (continued . . .)

-1-

## Background

[¶2.]        Bear Country is a family-owned South Dakota corporation.  The underlying action involved a dispute among Bear Country's family-member shareholders concerning the management and control of the business.  The family-member shareholders were split into two factions.  Because the two factions could not agree on the management and direction of Bear Country, they asked Judge Delaney to determine Bear Country's value so that one faction could buy out the other.

[¶3.]        Before trial, the two factions anticipated submitting financial records and expert testimony on Bear Country's value as part of the evidence.  Both factions submitted motions to close the courtroom when the financial information and testimony was to be presented on Bear Country's value.  The parties claimed that the proceedings needed to be closed to protect "confidential business information."

_____

(. . . continued)

        Florida District Court of Appeals granted a writ of prohibition to prevent a circuit court's referral of a child support matter to a general master in violation of that state's procedural requirements.  More recently, this Court issued its own writ of prohibition on January 18, 2007, directing a circuit court to vacate an invalid writ of prohibition that it had previously issued in a case.  *See Gray v. Gienapp,* 2007 S.D. 12, 727 N.W.2d 808.

        *Id.*  As in *Jundt,* "we hold that a writ of prohibition is the appropriate remedy for [Judge Delaney's] actions here." *Id.  See Sioux Falls Argus Leader v. Miller*, 2000 S.D. 63, ¶ 12, 610 N.W.2d 76, 83 (recognizing that a writ of prohibition was the appropriate writ when media outlets alleged that circuit court judge exceeded his authority by ordering a gag order in a criminal case). Furthermore, "A writ of prohibition proceeding is not specifically a review of the record below; it is a review of the trial court's jurisdiction and authority in respect to the challenged order and 'is preventative in nature rather than corrective.'" *Id.* (quoting Black's Law Dictionary at 1212 (6th ed. 1990)).

Neither side objected. Judge Delaney entered an order that (1) imposed a gag order on the parties and (2) closed the trial and court records. This order indicated that it was to protect Bear Country's "financial information," "proprietary and financial matters," and "trade secrets and proprietary information."

[¶4.]    After learning of Judge Delaney's order, the Media moved to intervene. The Media asserted that Judge Delaney did not have the authority to impose a gag order and close court proceedings and records. Judge Delaney rejected the Media's arguments. The Media then petitioned this Court for a writ of mandamus or prohibition. The Media asserted that Judge Delaney's gag order "unlawfully interfered with Media's First Amendment right to gather and report the news." The Media also asserted "that Judge Delaney's order excluding them from most of the court trial and court record improperly infringed on their qualified First Amendment and common law right of access to courts, trial participants and record."

[¶5.]    After reviewing the Media's petition, we granted the alternative writ because the Media did not have "a plain, speedy and adequate remedy in the ordinary course of law." We ordered Judge Delaney to show cause why the "writ should not be made permanent and why this Court should not enter a peremptory writ of mandamus directing [Judge Delaney] to rescind [his] orders of April 21, 2010, *nunc pro tunc* to April 19, 2010."

## Analysis

### *Mootness*

[¶6.] Judge Delaney initially argues that the Media's claims are moot because the Media had "a plain, speedy, and adequate remedy at law" in the form of a direct appeal. The Media initially filed both a notice of appeal and this writ to ensure that it complied with Court rules. The Media dismissed the direct appeal after we granted the alternative writ. By accepting original jurisdiction and granting the alternative writ, we acknowledged that seeking an alternative writ was the appropriate procedure.

[¶7.] Judge Delaney also claims the Media's issues are moot because the trial has been completed and "there are no further proceedings which the public may attend and the parties are free to speak even if the mandamus relief" is not granted. Accordingly, Judge Delaney concludes that "[m]andamus cannot compel an act – opening the trial to the public, or allowing parties the ability to speak to the media – that [are] no longer possible to perform."

[¶8.] Although Bear County's trial is complete, we will consider this case under an exception to the mootness doctrine because the issue presented is "capable of repetition yet evading review." *Sullivan v. Sullivan,* 2009 S.D. 27, ¶ 12, 764 N.W.2d 895, 899. This exception applies when: "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again[.]" *Id.* (citing *Matter of Woodruff,* 1997 S.D. 95, ¶ 15, 567 N.W.2d 226, 229 (citing *Rapid City Journal v. Cir. Ct. of the Seventh Jud. Cir.,* 283

N.W.2d 563, 565-66 (S.D. 1979) (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 546, 96 S. Ct. 2791, 2797, 49 L. Ed. 2d 683, 690 (1976)))). Here, the Media's challenge was not fully litigated because Bear Country's action ended before the Media's petition for an alternative writ was granted. *See id.* Additionally, there is a "reasonable expectation" that the Media will be prevented from attending court proceedings in the future under similar circumstances. *See id.* ¶ 13. We therefore address the issues presented.

### *Right of Access to Trials*

[¶9.]    We first address whether the media and public have a qualified right to attend a civil trial and access documents filed with a court. It is established that a right of access to civil court proceedings exists. *See Miller*, 2000 S.D. 63, ¶ 10, 610 N.W.2d at 82 (recognizing the media and public's equal First Amendment right to attend court proceedings). But whether that right stems from the First Amendment or the common law has not been specifically addressed by this Court. Both the First Amendment and the common law involve a presumption of openness, but the scrutiny required of the trial judge's decision to close the proceedings differs. Under a First Amendment analysis, the presumption of openness can only be overcome with a showing of an "overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 510, 104 S. Ct. 819, 823, 78 L. Ed. 2d 629 (1984). The common law, on the other hand, balances the competing interests of the parties. With either analysis, we review the trial court's findings of fact under a clearly erroneous standard, its application of the law de

novo, and the ultimate decision to close a proceeding for an abuse of discretion. *See In the Matter of M.C.*, 527 N.W.2d 290, 293 (S.D. 1995).[2]

[¶10.] In applying a First Amendment analysis, the United States Supreme Court held in *Richmond Newspapers, Inc. v. Virginia* that "the right to attend criminal trials is implicit in the guarantees of the First Amendment: without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated." 448 U.S. 555, 580, 100 S. Ct. 2814, 2829, 65 L. Ed. 2d 973 (1980) (citations and quotations omitted). The Supreme Court in a later case highlighted the value of an open trial as follows:

> The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Press-Enterprise Co.*, 464 U.S. at 508, 104 S. Ct. at 823 (citing *Richmond Newspapers, Inc.*, 448 U.S. at 569-71, 100 S. Ct. at 2823-24).

[¶11.] Justification for closing a criminal trial must be "weighty," supported by a compelling interest, and "narrowly tailored." *Id.* at 509-510, 104 S. Ct. at 824

---

2.      We note from the start that a court's decision to deny the media and public access to a trial is different from its decision to close court records.

(quoting *Globe Newspapers Co. v. Superior Ct.*, 457 U.S. 596, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982)). The Supreme Court explained:

> '[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where . . . the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.' The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* at 509-510, 104 S. Ct. at 824 (quoting *Globe Newspapers Co.*, 457 U.S. at 596, 102 S. Ct. at 2620). *See also El Vocero de Puerto Rico, et al. v. Puerto Rico et al.,* 508 U.S. 147, 151, 113 S. Ct. 2004, 2006, 124 L. Ed. 2d 60 (1993). As noted by Justice Brennan, closing a criminal trial to the public requires more than just an agreement between the parties and the trial judge. *See Richmond Newspapers, Inc.*, 448 U.S. at 585, 100 S. Ct. at 2831 (Brennan, J., concurring).

[¶12.]     In a more recent case involving access to jury voir dire in a criminal trial, the Supreme Court reiterated its prior rulings that:

> [a] public trial right rest[s] upon two different provisions of the Bill of Rights, [the First and Sixth Amendments] both applicable to the States via the Due Process Clause of the Fourteenth Amendment. . . . The Court has further held that the public trial right extends beyond the [Sixth Amendment Right of the] accused and can be invoked under the First Amendment. This requirement, too, is binding on the States.

*Presley v. Georgia* , __ U.S. __, __, 130 S. Ct. 721, 723, 175 L. Ed. 2d 675 (2010) (citations and quotations omitted).

[¶13.] In *Presley*, a Georgia trial court did not allow a family member of the defendant to sit in the courtroom during jury voir dire. The trial court denied a motion for a new trial because it did not want family members intermingling with prospective jurors because the jurors could overhear some "inadvertent comment or conversation." *Id.* at __, 130 S. Ct. at 722. The Georgia Supreme Court affirmed and "rejected Presley's argument that the trial court was required to consider alternatives to closing the courtroom." *Id.* The United States Supreme Court reversed and stated:

> The conclusion that trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear not only from this Court's precedents but also from the premise that 'the process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system.' The public has a right to be present whether or not any party has asserted the right.

*Id.* at __, 130 S. Ct. at 724-25 (citation omitted). The Supreme Court made it clear that in order for a trial court to exclude the public, it must articulate and make specific findings as to an overriding interest *and* must "consider all reasonable alternatives to closure," even if the parties have not proffered alternatives. *Id.* at __, 130 S. Ct. at 725.

[¶14.] We acknowledge that Supreme Court cases dealing with the public right of access to trials have been in the context of criminal cases. The Eighth Circuit Court of Appeals, however, applied the same principles to a civil proceeding involving contempt. *In re Iowa Freedom of Info. Council*, 724 F.2d 658 (8th Cir. 1983). The court analyzed the issue as follows:

> In *Globe Newspaper Co.* the Court stated that two features of criminal trials explain why a right to access should be afforded

> protection by the First Amendment. First, the criminal trial has historically been open to the public. Second, such access can enhance the quality and safeguard the integrity of the fact-finding process and foster an appearance of fairness. Without going into historical analysis, this Court notes, as was noted by a plurality opinion of Chief Justice Burger, that "historically both civil and criminal trials have been presumptively open." In addition, the presence of the public and press at civil proceedings will enhance and safeguard the quality of the fact-finding process, just as it does at criminal trials. Arguably, the public interest in securing the integrity of the fact-finding process is greater in the criminal context than the civil context, since the condemnation of the state is involved in the former but not the latter, but it is nonetheless true that the public has a great interest in the fairness of civil proceedings. Hence, we conclude that the protection of the First Amendment extends to proceedings for contempt, a hybrid containing both civil and criminal characteristics.

*Id.* at 661 (citations omitted).

[¶15.] In that case, the Eighth Circuit upheld limited closure because the record showed that trade secrets were involved. *See id.* The court recognized that in order for a trial court to determine if trade secrets are involved, it would need an *in camera* hearing, "as strictly limited as possible." *Id.* The *in camera* hearing would be closed but would be limited to testimony or evidence on "the issue of the existence of trade secrets and the damage that disclosure of those secrets might cause." *Id.* at 662. The court further admonished the district court for "simply accepting the representation of counsel . . . that trade secrets were involved." *Id.* at 663. The court stated, "Whether trade secrets are involved or not, and whether their revelation will cause damage to someone, are questions of fact, to be decided after receiving evidence. In such an important matter, courts should not simply take representations of interested counsel on faith." *Id.* Additionally, the court noted "that the presence of trade secrets will [not] in every case and at all events

justify the closure of a hearing." *Id.* at 663. Thus, "courts must proceed cautiously and with due regard to the uniqueness of the particular facts before them." *Id.*

[¶16.] The Third Circuit Court of Appeals also determined that "the public and the press possess a First Amendment and a common law right of access to civil proceedings; indeed, there is a presumption that these proceedings will be open." *Publicker Indus. Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984). That case involved alleged "sensitive" and "confidential" stockholder information. The *Publicker* court determined that "to limit the public's access to civil trials there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve that governmental interest." *Id.* at 1070. The record "must demonstrate an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 1069 (citation omitted). The court emphasized the importance of "findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* (citing *Press-Enterprise*, 464 U.S. at 510, 104 S. Ct. at 824). Possible overriding interests warranting closure may involve such things as trade secrets, attorney client privilege information, or contractual non-disclosure agreements. *Id.* at 1073.

[¶17.] In *Publicker*, the court reversed the trial court's closure because it was too extensive and constituted an abuse of discretion. Likewise, the trial court's sealing of certain transcripts was reversed. The trial court abused its discretion because it "failed to articulate overriding interests based on specific findings showing that the sealing of the transcripts essential to articulated interests of

Publicker and . . . failed to consider less restrictive means to keep the information from the public." *Id.* The court noted that "sensitive information" will not in all cases amount to "the kind of confidential commercial information that courts have traditionally protected." *Id.*

[¶18.]     In South Dakota, the media's right of access to juvenile trials was acknowledged in *In the Matter of M.C.*, 527 N.W.2d at 293. At that time the law provided that all juvenile trials were closed "unless the court [found] compelling reasons to require otherwise." *Id.* at 291 n.1. Although juvenile trials were closed by statute, we agreed with the media that it had a "qualified constitutional right of access" to a juvenile proceeding absent legislative design to protect and rehabilitate juveniles. *Id.* at 293. This qualified right was first discussed in an earlier case, *Associated Press v. Bradshaw*, 410 N.W.2d 577 (S.D. 1987), *superseded by statute* SDCL 26-7A-36. Although we discussed the need to balance the various constitutional rights and interests of the parties, we ultimately concluded that closure could only occur if it was "necessary to preserve higher values." *Id.* at 580. We stated, "Closure of juvenile proceedings should not occur unless specific supportive findings are made which demonstrate that closure is necessary to preserve higher values and the order must be narrowly tailored to serve that interest." *Id.* at 580.

[¶19.]     "Specific supportive findings" led us to affirm the trial court's closure of a juvenile proceeding in *In the Matter of Hughes County*, 452 N.W.2d 128, 133 (S.D. 1990). There, the trial court considered the factors outlined in *Bradshaw* and entered findings accordingly. These findings were not clearly erroneous and

supported the closure decision. The State's "strong interest in preserving the confidentiality of juvenile proceedings" outweighed the public and media's First Amendment right of access. *Id.* at 132. The trial court had also considered alternatives to closure that were rejected by the media. Additionally, the closure was temporary, in that the trial court only closed the adjudicatory hearing, not the dispositional hearing.

[¶20.]     In summary, the United States Supreme Court has established the media and public's First Amendment right of access to criminal trials. The Eighth Circuit Court of Appeals extended that right to civil contempt trials. And our Court has recognized the right as applied to juvenile trials. The rationale applied in reaching those conclusions is similar and consistent – "openness enhances both the basic fairness of . . . trials and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise Co.*, 464 U.S. at 508, 104 S. Ct. at 823 (citing *Richmond Newspapers, Inc.*, 448 U.S. at 569-71, 100 S. Ct. at 2823-24). Logically, the rationale for openness applies equally to civil trials. Open civil trials also protect the integrity of the system and assure the public of the fairness of the courts and our system of justice. We, therefore, hold that the First Amendment affords the media and public a qualified right of access to civil trials in this state.

[¶21.]     The *Publicker* court succinctly set forth the procedure and substance a trial court should follow before closing a trial. The court explained:

> Procedurally, a trial court in closing a proceeding must both articulate the countervailing interest it seeks to protect and make findings specific enough that a reviewing court can determine whether the closure order was properly entered. Substantively, the record before the trial court must demonstrate an overriding interest based on findings that

> closure is essential to preserve higher values and is narrowly
> tailored to serve that interest.

733 F.2d at 1071 (citations and quotations omitted).  We now adopt the *Publicker* court's analysis as it comports with, and augments, the review and analysis we applied in *In re M.C.*, 527 N.W.2d at 293, and *In re Hughes County*, 452 N.W.2d at 133.

### The Procedure and Reasoning Used by Judge Delaney was Flawed.

[¶22.]    Turning to the case before us, we find several problems with the procedure used and decision reached by Judge Delaney.  First, Judge Delaney did not correctly apply the First Amendment or the common law presumption of openness.  Second, he did not require the parties to show that closure was necessary "to preserve higher values."  Third, he failed to "articulate[ ] . . . findings specific enough that a reviewing court c[ould] determine whether the closure order was properly entered."  And finally, he failed to narrowly tailor the closure order.

[¶23.]    Judge Delaney's initial order excluding the media and public was entered in response to motions from the parties.  The order "closed the trial and records of this matter from the public including the press."  After the media intervened, Judge Delaney acknowledged that the first order may have been too broad.  He then modified his order closing all portions of the trial dealing with "internal financial affairs (General Ledgers, P&L's) of Bear Country and its proprietary data (past and future plans for development, expansion, and the like) and trade secrets (sources of stock, care and operating methods for maintaining the health and exhibition of the stock, etc.)."

[¶24.]     In determining Bear Country's value, Judge Delaney found that "a number of exhibits and testimony will directly involve trade secrets, proprietary matters, or the internal financial information of Bear Country."  When and how Judge Delaney arrived at that finding is unclear.  The record does not indicate that a prior *in camera* proceeding took place or that the parties had provided him with information to support that finding.  Judge Delaney's conclusory findings appear to be based on what he expected the evidence to be.  Such conclusory findings are insufficient and prevent meaningful appellate review.

[¶25.]     Further, Judge Delaney indicated that he closed the proceedings and records based on SDCL 15-15A-8, which limits public access to certain court records, and SDCL 37-29-5, which limits public access to trade secret information.  In reference to these two statutes, Judge Delaney stated: "Upon request of the parties, there seems to be no leeway for the Court but to grant protection for these items."  He reasoned that the legislature had "broad power" to close hearings, such as juvenile cases and abuse and neglect cases; "*Ergo,* the aforementioned statutes should receive the same respect."

[¶26.]     Initially, Judge Delaney's reliance on SDCL 15-15A-8 as authority to close the trial is misplaced.  SDCL 15-15A-8 does not pertain to trial closure.  It pertains only to court records and provides that confidential numbers and financial documents can be excluded from public access. [3]  Further, SDCL 15-15A-9 requires

---

3.     SDCL 15-15A-8 permits limiting public access to certain court records:

> The following information in a court record is not accessible to
> the public.

(continued . . .)

litigants to file a confidential information form to prevent public access to confidential numbers and financial documents. In addition, the procedure for accessing the confidential information is outlined in SDCL 15-15A-10, which allows access "if the court finds that the public interest in granting access or the personal interest of the person seeking access outweighs the privacy interests of the parties or dependent children. In granting access the court may impose conditions necessary to balance the interests consistent with this rule." *Id.*[4] While SDCL 15-

---

(. . . continued)

    (1)    Social security numbers, employer or taxpayer identification numbers, and financial account numbers of a party or party's child.

    (2)    Financial documents such as income tax returns, W-2's and schedules, wage stubs, credit card statements, financial institution statements, credit card account statements, check registers, and other financial information.

4.    SDCL 15-15A-10 provides:

    (a)    Any person may file a motion, supported by affidavit showing good cause, for access to confidential financial documents. Written notice of the motion shall be required.

    (b)    If the person seeking access cannot locate a party to provide the notice required under this rule, after making good faith reasonable effort to provide such notice as required by applicable court rules, an affidavit may be filed with the court setting forth the efforts to locate the party and requesting waiver of the notice provisions of this rule. The court may waive the notice requirement of this rule if the court finds that further good faith efforts to locate the party are not likely to be successful.

    (c)    The court shall allow access to confidential financial documents, or relevant portions of the documents, if the court finds that the public interest in granting access or the personal interest of the person seeking access outweighs the privacy interests of the parties or

(continued . . .)

-15-

15A-8 may have allowed Judge Delaney to deny access to certain information in the court records, such as social security numbers or tax identification numbers, his actual closure was much broader and inconsistent with statutory procedure. Based on the broad closure order, we are unable on review to determine if a legitimate reason existed to seal parts of the record. *See United States v. McDougal*, 103 F.3d 651, 656 (8th Cir. 1996).

[¶27.]     The trial court's reliance on SDCL 37-29-5 is similarly misplaced.[5] This statute allows trial and record closure to "preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval." *Id.* [6] The trial court,

_____

(. . . continued)

> dependent children. In granting access the court may impose conditions necessary to balance the interests consistent with this rule.

5.     SDCL 37-29-5 provides:

> In an action under this chapter, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

6.     Trade secrets are afforded protection in some cases. *See* SDCL ch. 37-29 & SDCL ch. 1-27. SDCL 37-29-1(4) sets forth the definition of what constitutes a trade secret:

> (4) "Trade secret," information, including a formula, pattern,

(continued . . .)

however, did not follow the procedure outlined in the statute. The trial court did not conduct an *in camera* hearing, make specific findings, or narrowly limit closure to the trade secret evidence. *See* SDCL ch. 37-29; *Weins v. Sporleder*, 1997 S.D. 111, ¶ 16, 569 N.W.2d 16, 20 (recognizing that the existence of a trade secret requires both a legal and factual inquiry into whether the information in question fits the statutory definition of a trade secret); *Standard & Poor's Corp., Inc. v. Commodity Exch. News Serv.*, 541 F. Supp. 1273, 1278 (S.D.N.Y. 1982). In fact, a review of the record indicates that the evidence at trial involved little, if any, information concerning trade secrets.[7]

---

(. . . continued)

        compilation, program, device, method, technique or process, that:

> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

7.    Below is a list of all witnesses who testified at Bear Country's trial, an indication whether the media and public were excluded during their testimony, and a summary of the general subjects the witnesses discussed:

*Sean Casey*: The media and public were excluded from the courtroom after Sean's background with Bear Country was established. Testimony was given after the media and public were removed on the following topics: Sean's position at Bear Country; Bear Country's financial position, both general and specific; Bear Country's growth; capital improvements; number of annual visitors; advertising strategy; Casey family dysfunction; Bear Country Board activities; and, Sean's opinion on Bear Country's value.

*Ken Simpson*: While not entirely clear from the record, it appears that the media and public were excluded from all of Simpson's testimony. Simpson is

(continued . . .)

_____
(. . . continued)

a real estate appraiser testifying about Bear Country's value.  He testified about his qualifications; the appraisal process, and his ultimate appraisal of Bear Country.

*Ericka Heiser:* The media and public were excluded from all of Heiser's testimony.  Heiser is a CPA from Ketel Thorstenson, LLP testifying about Bear Country's value.  She testified about her qualifications; the valuation process used, and Bear Country's value.

*Margaret Pauline Casey*: President and founder of Bear Country.  The media and public were initially excluded from hearing her testimony but were allowed to enter the courtroom after a break.  Margaret testified about her position at Bear Country, conflicts related to a statue of Doc Casey (Margaret's deceased husband and Bear Country's co-founder), Bear Country's revenue, Casey family dysfunction, legal fees, and Bear Country's general financial position.

*Kevin Casey:* The media and public were initially present but were asked to leave while Kevin was examined on financial matters.  Kevin testified about his role at Bear Country, Bear Country's finances, capital expenditures, and dividends.  Kevin also testified as a rebuttal witness about Bear Country's development plan.

*Dennis Casey:* The media and public were excluded from all of Dennis's testimony.  Dennis testified about his role at Bear Country, Bear Country's finances, capital expenditures, and dividends.

*Michael Zeeb:* Zeeb is a CPA who testified about Bear Country's total valuation.  The media and public were excluded from hearing all of Zeeb's testimony.  Zeeb testified about his background, his valuation methodology, and his opinion on Bear Country's total value.

*Joe Lux:* Lux testified about attorneys' fees.  The media and public were excluded from all of Lux's testimony.

*Michael Casey:* The press was permitted to hear Michael's testimony.  Michael testified about his background at Bear Country, Bear Country's capital expenses, employee salaries, and improvements made at Bear Country.

At the beginning of the final day of trial, plaintiff's attorney made an offer of proof on Pauline Casey's financial records.  Plaintiff's attorney then asked

(continued . . .)

[¶28.]    In addition to citing SDCL ch. 15-15A and SDCL ch. 37-29 as justification for closing the trial, Judge Delaney stated:

> It seems that the analysis in terms of benefit to the public and detriment to the parties is both simple and heavily one-sided. Beyond the fact that there will likely be a realignment of the family holdings in Bear Country, disclosure and publication of the financial records for most the past decade, the analysis of income, expenses, past and future projects, the costs associated therewith and the expected return on investments will have little or no impact whatsoever on the public save, perhaps, casual conversation and the curiosity. It will certainly sell papers, but it has little value as news. On the other hand the actual and potential harm to the interests of the existing shareholders, and those who may remain, is significant and results in an invasion of privacy in affairs never intended nor expected to become the subject of headlines, videos, news commentators and street gossip. In addition to being an invasion of privacy the publication of the data referenced above carries an unnecessary risk of irreparable damage to the parties and the business.

Most of Judge Delaney's pronouncement, however, is not supported by specific findings. He speaks generally of "potential harm" and "unnecessary risk of irreparable damage to the parties and business." But without specific findings, meaningful review is illusive.

[¶29.]    Because Judge Delaney erroneously applied the First Amendment's presumption of openness, did not require the parties to show that closure was necessary to preserve higher values, did not articulate specific findings permitting meaningful review, and did not narrowly tailor the closure order, we conclude that

---

(. . . continued)

that the press be removed from the courtroom. Judge Delaney agreed and the press was removed during the offer of proof.

In sum, a review of the trial transcripts indicates that nearly 90% of all trial proceedings were closed.

he abused his discretion in closing the trial proceedings from the media and public. Accordingly, we agree with the Media that a permanent writ of prohibition be issued, effectively rescinding Judge Delaney's order preventing the Media and public from attending Bear Country's trial proceedings.

### *Judge Delaney's Gag Order*

[¶30.]        The Media also challenges Judge Delaney's participant gag order. Judge Delaney issued a gag order preventing the parties to the Bear Country litigation from discussing "privileged and financial information" and "the trial proceedings in whole."

[¶31.]        Although Judge Delaney imposed the gag order to protect "privileged and financial information," in his response brief, he does not detail any basis for imposing a gag order to protect those interests other than "an inherent power, as well as a duty, to conduct a fair and orderly trial [and] . . . [that] the court has the authority to issue such proper orders as may be necessary from time to time." This inherent power, however, has only been discussed in criminal cases in South Dakota. *See State v. Means,* 268 N.W.2d 802, 808 (S.D. 1978) (involving a trial court's order to "requir[e] spectators to stand as [the judge] entered the courtroom" in an apparent attempt to "maintain orderly proceedings"). Gag orders in criminal cases are usually designed to protect a defendant's right to a fair trial by an impartial jury. *See Miller,* 2000 S.D. 63, 610 N.W.2d 76. The Casey family's dispute over Bear Country's value was a civil case tried to the court, not a jury. Therefore it is unclear how prohibiting the trial participants from discussing the case with others would affect Judge Delaney's ability to "conduct a fair and orderly

[civil bench] trial." Even though Judge Delaney had the unquestioned authority to ensure a "fair and orderly trial," that standard has no application here. *See id.* ¶ 12.

[¶32.] We are not persuaded that Judge Delaney had statutory or legal authority to issue the gag order under the facts and circumstances of this case. Accordingly, we agree with the Media that a permanent writ of prohibition be issued, effectively rescinding Judge Delaney's order preventing the parties from discussing the case outside of court.

[¶33.] The Media's request for a permanent writ of prohibition is granted.

[¶34.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and SEVERSON, Justices, concur.

[¶35.] WILBUR, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.