#30804-a-SPM
**2025 S.D. 58**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,            Plaintiff and Appellee,

     v.

LARRY GENE RICHTER,            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JON C. SOGN
Judge

\* \* \* \*

NICOLE J. LAUGHLIN
Sioux Falls, South Dakota            Attorney for defendant and
           appellant.

MARTY J. JACKLEY
Attorney General

ANGELA R. SHUTE
Assistant Attorney General
Pierre, South Dakota            Attorneys for plaintiff and
           appellee.

\* \* \* \*

ARGUED
OCTOBER 8, 2025
OPINION FILED **11/5/25**

#30804

MYREN, Justice

[¶1.] Larry Richter was convicted of three counts of sexual contact with a person incapable of consenting. D.W., the victim of all three counts, is a developmentally disabled adult. At trial, the circuit court allowed D.W. to testify while holding a stuffed animal. The circuit court denied Richter's motions for judgment of acquittal made at the close of the State's evidence and at the end of the trial. Richter appeals these two issues, along with two others that he failed to preserve for appellate review—one involving the trial testimony of a physician that evaluated D.W. following his encounters with Richter and the other relating to the State's cross-examination of Richter. We affirm.

## Factual and Procedural Background

[¶2.] Richter hosted a Fourth of July celebration at his home in Sioux Falls. Richter provided food, fireworks, and other amenities for his numerous guests. The festivities began on the third and lasted into the early hours of the fourth.

[¶3.] D.W. and his family are Richter's neighbors and attended Richter's celebration. D.W. was nineteen years old at the time, but is developmentally disabled, functioning at the intellectual level of a seven-year-old. D.W.'s mother, Tracy, is his court-appointed guardian and conservator. At the trial, she testified that D.W. has difficulty learning, that his speech was delayed as a child, that he does not have a driver's license, that he cannot live independently, and that he has difficulty reading and writing.

[¶4.] In the days following the celebration, D.W. reported that Richter had touched him inappropriately on three occasions. One incident occurred on a four-

-1-

wheeler during the afternoon of July 3. The guests at the party were riding Richter's four-wheelers, and D.W. asked if he could go for a ride. Richter let D.W. drive a four-wheeler while Richter sat behind him. D.W. reported that while he was driving the four-wheeler, Richter placed one hand around him and the other on D.W.'s genitals over his clothing. D.W. testified that he asked Richter to stop that touching, but that Richter refused to do so.

[¶5.] During the second incident, D.W. and Richter were sitting on top of a covered hot tub in Richter's backyard talking. D.W. said that Richter touched his "private parts" over the clothing. D.W. testified that he told Richter to stop, but that "[h]e kept doing it. I [told] him lots of times to stop, but he kept on doing it." Tracy came to check on D.W. around the time of the incident, and Richter removed his hand when Tracy approached. D.W. explained that he wanted to tell her what was happening, but he did not because he was scared.

[¶6.] The final incident occurred behind a trailer in Richter's yard. At Richter's request, D.W. met him behind the trailer. D.W. described that incident as follows:

> Q: So tell us what happened when you got behind the trailer?
> A: We got behind the trailer and - - we got behind the trailer, and he sat down with me on the trailer. And he reached for the ball, but this time instead of on the pants, he went inside my pants, on the ball inside.
> Q: So did his bare skin touch your bare skin?
> A: Yes. It did.
> Q: And did you say anything?
> A: I told him to stop.
> Q: What did he say?
> A: He kept doing it.
> Q: So when his hand was on your bare skin, was it for just a short period of time or a long period of time?
> A: Long period of time.

[¶7.]     After D.W. reported these incidents, Tracy recorded a phone call with Richter during which she confronted him about D.W.'s accusations. During the phone call, Richter made the following statements:

| | |
|---|---|
| Richter: | That's when I actually touched him there, and I never even got my hand down his pants and touched his testicles. |
| | . . . |
| Richter: | I did back there two times. |
| Tracy: | Okay, you did admit then, you did touch it a couple times. |
| Richter: | Yes, back there on the thing. |
| Tracy: | On the four-wheeler. |
| Richter: | No, not. No, on the four-wheeler on the outside yes. I had my hands around his crotch. |
| | . . . |
| Richter: | I said does this bother you and he says no . . . and I reached my hand down, but that was on the outside. |
| | . . . |
| Tracy: | Behind the trailer is when you put your hand down his pants. |
| Richter: | Oh, yeah, that, uh, well I tried, I started reaching down towards him. I was going to[.] |
| | . . . |
| Richter: | I admit to those three things. |

After recording the phone call, Tracy contacted law enforcement, shared the recorded phone call, and explained that D.W. had intellectual disabilities. The recorded phone call was received into evidence at trial.

[¶8.]     A detective referred D.W. to Child's Voice for an evaluation. Child's Voice is a hospital-based advocacy center that evaluates children and developmentally disabled adults who may be victims of abuse or neglect. Dr. Nancy Free interviewed D.W. At the trial, Dr. Free testified that "[D.W.] clearly has some delays[,]" and that "[h]e processes much more slowly than his peers without disabilities. He has difficulty problem solving as well." She also explained that

individuals with developmental disabilities are at an increased vulnerability to various kinds of abuse.

[¶9.] Richter was indicted for three counts of sexual contact with a person incapable of consenting. After learning that D.W. intended to testify while holding a stuffed animal (a monkey named "Ish" that holds a banana), Richter filed a motion in limine to prohibit D.W. "from having a stuffed animal with him on the witness stand." The circuit court reserved ruling on Richter's motion until the first morning of trial because it wanted to discuss the issue with D.W. The circuit court spoke with D.W. outside the presence of the jury, with Richter, his attorney, and the State's Attorneys present. D.W. explained that he was nervous about testifying and that he had the stuffed animal with him "[b]ecause he's a support to me. Because - - in case I need calmed down, he keeps me calmed down." After questioning D.W., the circuit court allowed him to testify with the stuffed animal:

> Well, under the circumstances, I am going to allow him to have that stuffed animal with him. As [D.W.] said, it helps him remain calm. Helps with nerves when he's testifying. I am going to find that it's appropriate for him to be able to have that stuffed animal while he's testifying. And I do not see that it would present a danger of unfair prejudice to the defendant.

[¶10.] Following the State's case-in-chief, Richter requested a judgment of acquittal, arguing the State did not establish "a prima facie case." The circuit court denied the motion and denied a renewed motion at the end of the trial. The jury convicted Richter on all three counts.

[¶11.] Richter appeals, raising four issues for this Court's review: (1) whether the circuit court abused its discretion when it allowed D.W. to testify while holding a stuffed animal; (2) whether the circuit court plainly erred during the State's cross-

examination of Richter; (3) whether the circuit court plainly erred during the State's direct examination of Dr. Free; and (4) whether the circuit court erred when it denied Richter's motion for judgment of acquittal.

**Decision**

### 1. *Whether the circuit court abused its discretion when it allowed D.W. to testify while holding a stuffed animal.*

[¶12.] "Our standard of review for evidentiary rulings requires a two-step process: first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether this error was a prejudicial error[.]" *State v. Richard*, 2023 S.D. 71, ¶ 22, 1 N.W.3d 654, 660 (alteration in original) (quoting *State v. Hankins*, 2022 S.D. 67, ¶ 20, 982 N.W.2d 21, 30). "An abuse of discretion is defined as a 'fundamental error of judgment, a choice outside the range of permissible choices, a decision, which on full consideration is arbitrary or unreasonable.'" *State v. Rouse*, 2025 S.D. 29, ¶ 24, 23 N.W.3d 467, 476 (quoting *State v. Belt*, 2024 S.D. 82, ¶ 20, 15 N.W.3d 732, 737). "An error is prejudicial if there is 'a reasonable probability that, but for [the error], the result of the proceeding would have been different.'" *Id.* (alteration in original) (quoting *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686).

[¶13.] Richter contends that because the Legislature has adopted several statutes that explicitly provide certain accommodations to child witnesses and developmentally disabled witnesses, the circuit court has no authority to provide accommodations beyond those identified in statute. He asserts that "[t]here is no authority for the trial court to authorize a comfort item for an adult witness, even

an adult witness with developmental disabilities." Richter cites the following statutes: (1) SDCL 26-8A-31.1(5), which, among other things, allows a child victim of various crimes to have "an item used to provide psychological comfort" while testifying; and (2) SDCL 23A-24-10, which allows "a child witness or a witness having a developmental disability to be accompanied by a certified therapeutic dog during the witness' testimony[.]"

[¶14.] This Court has recognized that circuit courts possess broad authority over the conduct of trials and how witnesses may be examined. *See Sioux Falls Argus Leader v. Miller*, 2000 S.D. 63, ¶ 12, 610 N.W.2d 76, 83 (acknowledging the circuit court's "duty to maintain order, dignity and decorum in the courtroom"); *Rapid City J. v. Delaney*, 2011 S.D. 55, ¶ 31, 804 N.W.2d 388, 399 (citing *State v. Means*, 268 N.W.2d 802, 808 (S.D. 1978)) (recognizing the circuit court has the "inherent power, as well as a duty, to conduct a fair and orderly trial" and "the authority to issue such proper orders as may be necessary from time to time" in criminal cases); *Daudel v. Wolf*, 30 S.D. 409, 138 N.W. 814, 815 (1912) ("The manner of conduct and control of trials in relation to the decorum of the parties and counsel towards the court and each other, and in preserving the dignity of the court, are matters inherently within the discretion of the trial judge[.]"). This discretionary power exists to ensure that the trial process is efficacious, oriented to discovering the truth, and protective of witnesses. *See* SDCL 19-19-611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) Make those procedures effective for determining

the truth; (2) Avoid wasting time; and (3) Protect witnesses from undue harassment or undue embarrassment.").

[¶15.]     While SDCL 26-8A-31.1 and SDCL 23A-24-10 explicitly authorize specific witness accommodations, neither statute expresses any legislative intent to limit a circuit court's discretion about how it manages witnesses or the presentation of their testimony.  Consequently, the correct inquiry is whether the circuit court abused its discretion when it allowed D.W. to hold a stuffed animal while testifying.

[¶16.]     D.W. was twenty-one years old at the time of trial but had the intellectual abilities of a seven-year-old.  D.W. explained during his conversation with the circuit court that he was nervous about testifying and that his stuffed animal helps keep him calm.  The circuit court could have reasonably concluded that allowing D.W. to hold a stuffed animal while testifying was an effective method to help him remain calm and endure the trial process to arrive at the truth.  The circuit court did not abuse its discretion.

### 2.     *Whether the circuit court plainly erred during the State's cross-examination of Richter.*

[¶17.]     Richter argues that a portion of the State's cross-examination of Richter was an attempt to relieve the State of its burden of proof and require Richter to prove his innocence.  He focuses on the following line of questioning:

| | |
|---|---|
| State: | You knew that when law enforcement called you that there was some allegations.  Right? |
| Richter: | Yes. |
| State: | But you didn't tell law enforcement that you made this false confession to keep [D.W.'s mother] to stop bothering you? |
| Richter: | No.  I didn't talk to the officer at all.  I said I would meet with him, and I called my lawyer. |

| | |
|---|---|
| State: | It would probably be in your best interests to share that information so you wouldn't get arrested if it truly was a false confession? |
| Richter: | I don't know nothing about that. |
| State: | You also said you had phone records, text message records, and those weren't gone by July 21st, when law enforcement called you. |
| Richter: | Yes, they were - - no. They wouldn't have been back then, no. |
| State: | You could have shared those and you didn't? |
| Richter: | I didn't talk to the police. |
| State: | So you would have us believe that you were accused of serious crimes and arrested and you didn't bother to say this was a false confession? |
| Richter: | I was accused. I wasn't arrested until, like, a year and a half later. |
| State: | But you never told anybody? |
| Richter: | I told my lawyer. |
| State: | Not law enforcement or somebody that could have changed that, if that were true? |
| Richter: | What are you saying? I don't know what you are asking. |

Richter submits that "[t]his line of questioning resulted in the jury being left with the impression that the defendant had an obligation to put forth evidence of his innocence at trial."

[¶18.]    Richter failed to preserve this claim because he did not object to the State's line of questioning.[1]  Accordingly, this Court must review this claim for plain error. *See State v. Guziak*, 2021 S.D. 68, ¶ 10, 968 N.W.2d 196, 200 ("This Court reviews unpreserved issues for plain error." (citation omitted)).  "To demonstrate plain error, [the appellant] must establish that there was: '(1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it seriously affect[s] the fairness, integrity, or public

---

1.    Richter's attorney on appeal was not his counsel at trial.

reputation of the judicial proceedings.'" *Id.* (alterations in original) (quoting *State v. Jones*, 2012 S.D. 7, ¶ 14, 810 N.W.2d 202, 206).

[¶19.]    "Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods." *State v. Rudloff*, 2024 S.D. 73, ¶ 54, 15 N.W.3d 468, 487 (quoting *State v. Patterson*, 2017 S.D. 64, ¶ 18, 904 N.W.2d 43, 49–50). "There are 'no hard and fast rules [that] exist which state with certainty when prosecutorial misconduct reaches a level of prejudicial error which demands reversal of the conviction and a new trial; each case must be decided on its own facts.'" *State v. Krueger*, 2020 S.D. 57, ¶ 48, 950 N.W.2d 664, 676 (alteration in original) (quoting *State v. McMillen*, 2019 S.D. 40, ¶ 27, 931 N.W.2d 725, 733). "'A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone,' but, if the prosecutor's conduct affects the fairness of the trial when viewed in the context of the entire proceeding, reversal can be warranted." *McMillen*, 2019 S.D. 40, ¶ 27, 931 N.W.2d at 733 (quoting *State v. Stetter*, 513 N.W.2d 87, 90 (S.D. 1994)).

[¶20.]    While a prosecutor has a duty to ensure a criminal defendant receives a fair trial, "[t]here is no question that a prosecutor may suggest that a defendant's testimony is not credible by drawing the jury's attention to the defendant's inconsistent statements." *State v. Pursley*, 2016 S.D. 41, ¶ 14, 879 N.W.2d 757, 761. "[W]hen a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness.'" *Id.* (alteration in original) (quoting *Portuondo v. Agard*, 529 U.S. 61, 69 (2000)).

[¶21.]     The recorded phone call, in which Richter admitted to D.W.'s accusations, was received at trial and played for the jury.  Richter took the stand and denied touching D.W. inappropriately.  This testimony was inconsistent with his admissions during the phone call.  On cross-examination, the State questioned Richter extensively about those inconsistencies.  Richter asserted that he lied to Tracy during the recorded phone call to stop her from bothering him about the allegations.  The State's line of questioning attacked the credibility of that assertion by noting that Richter had not taken the opportunity to explain to law enforcement that his admissions during the phone call were lies to get rid of Tracy.

[¶22.]     When read in context, the State's line of questioning aimed to impeach the credibility of Richter's testimonial claim that he made false admissions during the phone call to convince Tracy to leave him alone.  When Richter took the stand, he opened himself to an attack on his credibility.  "[I]mpeachment follows the defendant's own decision to cast aside his cloak of silence" by taking the stand, and "the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980); *see also Harris v. New York*, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.  But that privilege cannot be construed to include the right to commit perjury.  Having voluntarily taken the stand, [the defendant] was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." (internal citations omitted)); *Portuondo*, 529 U.S. at 69 ("The prosecutor's comments in this case, by contrast, concerned

-10-

respondent's *credibility as a witness*, and were therefore in accord with our longstanding rule that when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness.'" (citation omitted)).  The challenged line of questioning legitimately impeached the credibility of Richter's claim that he had falsely confessed during the phone call.  Had his counsel objected, the court would not have erred by overruling the objection.  Because the circuit court did not commit error regarding the State's cross-examination of Richter, we need not address the remaining plain error review considerations.[2]

### 3. Whether the circuit court plainly erred during the State's direct examination of Dr. Free.

[¶23.]    Richter's third claim of error relates to the following testimony provided by Dr. Free:

> State:    And being with Child's Voice, have you had the opportunity to study and determine individuals that might be most susceptible to being abused?
>
> Dr. Free:    Yes.  So some people are more vulnerable versus other people to different types of abuse and neglect, physical, sexual, emotional.
>
> State:    What has your research, your study, your education told you about individuals with disabilities?
>
> Dr. Free:    That individuals with disabilities have an increased vulnerability to all types of maltreatment, including abuse and neglect, physical abuse, sexual abuse, emotional abuse, all types of neglect.

---

2.    The argument advanced in Richter's opening brief is premised on his claim that the prosecutor's argument constituted a shifting of the burden of proof.  He did not argue that he had received *Miranda* warnings, and the State's cross-examination presented the problem identified in *Doyle v. Ohio*, 426 U.S. 610 (1976).  Any such argument would be equally unavailing because this record contains no indication that Richter was given any *Miranda* warning.

Richter did not object during that portion of Dr. Free's testimony. Accordingly, this Court must review this claim for plain error. The plain error rules discussed above, see *supra* ¶ 18, are applicable here as well.

[¶24.] Richter does not argue that Dr. Free was not qualified to give expert testimony. Rather, he argues her testimony that developmentally disabled adults are more vulnerable to sexual abuse was not relevant and that it invaded the province of the jury by improperly bolstering the credibility of D.W.'s testimony.

[¶25.] "Evidence is relevant if: (a) It has any tendency to make a fact more or less probable than it would be without the evidence; and (b) The fact is of consequence in determining the action." SDCL 19-19-401. In the context of expert testimony, the inquiry "is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *State v. Huber*, 2010 S.D. 63, ¶ 33, 789 N.W.2d 283, 293 (citation omitted).

[¶26.] Dr. Free's testimony that developmentally disabled individuals have an increased vulnerability to abuse was relevant. As an expert, Dr. Free was permitted to testify "about general principles, without ever attempting to apply [those] principles to the specific facts of the case" so long as that generalized testimony would assist the trier of fact. *State v. Johnson*, 2015 S.D. 7, ¶ 33, 860 N.W.2d 235, 248 (alteration in original) (citation omitted). Dr. Free's testimony was reliable, fit the facts of the case, and allowed the jury to assess the evidence with a more thorough understanding of the vulnerabilities of developmentally disabled adults. The circuit court did not commit any error by admitting this testimony.

[¶27.] Richter suggests that Dr. Free's testimony that developmentally disabled individuals are more vulnerable to sexual abuse invaded the province of the jury or amounted to a voucher of D.W.'s credibility. "It is the function of the jury to resolve evidentiary conflicts, determine the credibility of witnesses, and weigh the evidence." *State v. Buchholtz*, 2013 S.D. 96, ¶ 24, 841 N.W.2d 449, 457 (citation omitted). "Expert opinions that only tell a jury what conclusions they should reach are impermissible as overly intrusive on the province of the jury." *State v. Patterson*, 2017 S.D. 64, ¶ 23, 904 N.W.2d 43, 50 (citation omitted). More specifically, "[e]xperts cannot pass judgment on a witness's truthfulness in the form of a medical opinion." *State v. Snodgrass*, 2020 S.D. 66, ¶ 48, 951 N.W.2d 792, 807 (citation omitted).

[¶28.] Although an expert may not vouch for the credibility of other witnesses, "an expert's testimony may be admissible even if the expert's sole function is 'to educate the factfinder about general principles[.]'" *Johnson*, 2015 S.D. 7, ¶ 33, 860 N.W.2d at 248 (citation omitted). To that end, "we have cautioned courts to carefully distinguish between expert testimony that helps a jury reach their own determination of credibility and testimony that merely endorses the testimony of another." *Snodgrass*, 2020 S.D. 66, ¶ 48, 951 N.W.2d at 807 (citation omitted).

[¶29.] Richter relies on *Buchholtz*. In *Buchholtz*, the defendant was convicted of two counts of first-degree rape, one count of sexual contact, and one count of indecent exposure. 2013 S.D. 96, ¶¶ 7, 10, 841 N.W.2d at 453–54. The victim was a six-year-old girl. *Id.* ¶ 2, 841 N.W.2d at 452. A doctor assessed the forensic

interview of the child and conducted a physical examination. *Id.* ¶ 6, 841 N.W.2d at 453. At trial, the doctor explained that she had enough evidence to make a medical diagnosis that the child was a victim of sexual abuse. *Id.* ¶ 9, 841 N.W.2d at 454. This Court reversed. *Id.* ¶ 25, 841 N.W.2d at 457–58. It noted the general rule that "qualified experts can inform the jury of characteristics in sexually abused children and describe the characteristics the child exhibits[,]" *id.* ¶ 27, 841 N.W.2d at 458, but explained that the doctor's testimony "went beyond comparing characteristics to an outright medical diagnosis," *id.* ¶ 25, 841 N.W.2d at 457–58.

[¶30.]     Richter's reliance on *Buchholtz* is misplaced. Unlike the doctor in that case, Dr. Free never made a formal diagnosis of sexual abuse. She did not testify that D.W. was a victim of sexual abuse. She testified generally that developmentally disabled individuals have an increased vulnerability to abuse. Dr. Free was permitted to testify "about general principles, without ever attempting to apply [those] principles to the specific facts of the case[,]" *Johnson*, 2015 S.D. 7, ¶ 33, 860 N.W.2d at 248 (alteration in original) (citation omitted), and the circuit court did not commit error when it allowed her to testify that developmentally disabled individuals were at an increased vulnerability to sexual abuse. Because the circuit court did not commit any error, this Court need not assess the remaining plain error considerations.

### 4. *Whether the circuit court erred when it denied Richter's motion for judgment of acquittal.*

[¶31.]     "[A] motion for judgment of acquittal attacks the sufficiency of the evidence, which is a question of law whether the motion is considered before or after the jury's verdict." *State v. Wolf*, 2020 S.D. 15, ¶ 12, 941 N.W.2d 216, 220.

Accordingly, this Court reviews the denial of a motion for judgment of acquittal de novo. *Belt*, 2024 S.D. 82, ¶ 35, 15 N.W.3d at 740.

[¶32.] "The ultimate question . . . is 'whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *State v. Martin*, 2015 S.D. 2, ¶ 13, 859 N.W.2d 600, 606). This Court "accept[s] the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict." *Wolf*, 2020 S.D. 15, ¶ 13, 941 N.W.2d at 220 (quoting *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342). "We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence on appeal. If the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.*

[¶33.] Richter was charged with three counts of sexual contact with a person incapable of consenting under SDCL 22-22-7.2.[3] "To convict a defendant of sexual contact with a person incapable of consenting under SDCL 22-22-7.2, the State must prove: (1) the defendant knowingly engaged in sexual contact with the victim; (2) the defendant was fifteen years of age or older; (3) the victim was sixteen years of age or older; and (4) the victim was incapable of consenting to the sexual contact because of physical or mental incapacity." *Belt*, 2024 S.D. 82, ¶ 37, 15 N.W.3d at 740. Under SDCL 22-22-1.5(3), "mental incapacity" is defined as "a mental or

---

3. SDCL 22-22-7.2 provides: "Any person, fifteen years of age or older, who knowingly engages in sexual contact with another person if the other person is sixteen years of age or older and the other person is incapable, because of physical or mental incapacity, of consenting to sexual contact, is guilty of a Class 4 felony."

developmental disease or disability that renders a person incapable of appraising the nature of the person's conduct[.]" "Sexual contact" is defined as "any touching, not amounting to rape, whether or not through clothing or other covering, of the . . . genitalia . . . of any person with the intent to arouse or gratify the sexual desire of either party." SDCL 22-22-7.1.

[¶34.] Viewed in the light most favorable to the jury's verdict, the State put forth sufficient evidence to sustain Richter's convictions on each count. The evidence used to establish the last three elements applied to all counts. The detective who investigated the case testified that Richter's date of birth is December 19, 1966. Tracy testified that D.W.'s date of birth was March 12, 2002. Thus, there was sufficient evidence for the jury to find that Richter was fifteen years of age or older and that D.W. was sixteen years of age or older.

[¶35.] The evidence that went to establishing D.W.'s incapability of consenting to a sexual act came from Tracy and Dr. Free. Tracy testified that D.W. functions intellectually at the level of a seven-year-old, cannot live independently or maintain a job, does not have a driver's license, and has difficulty reading and writing. Additionally, during Tracy's testimony, the State introduced an affidavit that Tracy prepared when she sought to become D.W.'s court-appointed guardian and conservator. This affidavit described D.W.'s intellectual disabilities.

[¶36.] Dr. Free evaluated D.W. after he was referred to Child's Voice. She testified that "D.W. clearly has some delays." Dr. Free went on to testify that D.W. processes information much more slowly than his peers without disabilities and that he has difficulty solving problems. Based on the evidence presented, the jury

could have found that D.W. had a mental incapacity because he was "incapable of appraising the nature of the person's conduct[.]" SDCL 22-22-1.5(3). This finding would support a jury's determination that D.W. was unable to consent to sexual contact.

[¶37.] Similarly, the State put forth sufficient evidence on the first element—that Richter knowingly engaged in three sexual contacts with D.W. First, D.W. testified that while he was driving Richter's four-wheeler, Richter placed his hand on D.W.'s genitals. He also testified that he told Richter to stop, but that he refused to do so. Second, D.W. testified that when he and Richter were sitting on Richter's hot tub, Richter again placed his hand on D.W.'s genitals. He testified that he told Richter to stop, but that "[h]e kept doing it. I [told] him lots of times to stop, but he kept on doing it." Finally, D.W. testified that Richter told him to meet him behind one of his trailers. D.W. explained that while behind the trailer, Richter placed his hand on the inside of D.W.'s pants on his genitals. Corroborating D.W.'s testimony about each of these events was the phone call that Tracy recorded. In that phone call, Richter admitted to these acts.

[¶38.] Richter's argument regarding the sufficiency of the evidence is not well-oriented to how this Court reviews a denial of a motion for judgment of acquittal. His argument turns on his belief that D.W. was not a credible witness, and because he was the only person who relayed a firsthand account of the crimes, there was insufficient evidence to sustain the verdict. Richter argues that D.W. "had documented memory problems and issues with processing information." Richter also emphasizes that throughout the proceedings, D.W.'s account of the

chronological order of events changed.  However, the jury heard each of these arguments against D.W.'s credibility and still determined there was sufficient evidence to convict Richter.  "We do not resolve conflicts in the evidence," reweigh the evidence, or assess "the credibility of witnesses," as that is exclusively the function of the jury.  *Wolf*, 2020 S.D. 15, ¶ 13, 941 N.W.2d at 220 (citation omitted).  When viewed in the light most favorable to the verdict, there was sufficient evidence for the jury to conclude that Richter knowingly engaged in three acts of sexual contact with D.W.  We affirm.

[¶39.]      JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.